**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **Criminal No. 22-CR-76 (GMH)** |
| **v.** | ) | |
| | ) | |
| **ARIAN TAHERZADEH &** | ) | |
| **HAIDER ALI,** | ) | |
| **Defendants.** | ) | |

<u>**AMENDED AFFIDAVIT IN SUPPORT OF
CRIMINAL COMPLAINT**</u>

I, David Elias, being first duly sworn, hereby depose and state as follows:

<u>**INTRODUCTION**</u>

1.      I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed since August 2021.  Prior to this date, I worked as a felony prosecutor in Cuyahoga County, Ohio for over four years.  As a prosecutor, I investigated and prosecuted violent crime and drug-related offenses under state statutes.  I am currently assigned to Squad CR-15 of the FBI's Washington Field Office, Northern Virginia Resident Agency, and tasked with investigating allegations of public corruption and fraud.  As a Special Agent, I have investigated violations of federal statutes, including but not limited to public corruption, fraud, and other criminal matters. In the course of my duties, I have conducted and participated in numerous investigations. Among other things, I have participated in the execution of arrest and search warrants.

2.      As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute arrest warrants issued under the authority of the United States.

3.     This affidavit is submitted for the purpose of establishing probable cause.  The facts in this affidavit are based on my investigation, personal observations, training, and experience, as well as information conveyed to me by other law enforcement officials.  Because this affidavit is limited in purpose, it is not intended to include each and every fact and matter observed by me or known to the United States.

## PURPOSE OF AFFIDAVIT

4.     This amended affidavit is submitted in support of the criminal complaint filed April 5, 2022, charging the defendants, ARIAN TAHERZADEH (hereinafter "TAHERZADEH") and HAIDER ALI (hereinafter "ALI"), with one count of False Impersonation of an Officer of the United States, in violation of Title 18, United States Code, Section 912.

5.     This affidavit is further intended to correct one mistake contained in the original affidavit based on information obtained last night and to provide additional facts pertinent to probable cause developed in the investigation.  Specifically, the material changes to this affidavit from the original affidavit are:

      a.   In the Affidavit in support of the original Complaint, your Affiant stated that ALI was present when TAHERZADEH shot Witness 1 with an air rifle as part of a fraudulent law enforcement recruitment effort.  *See* Aff. in Supp. of Crim. Compl., ECF No. 1, at ¶ 7, 23.  That information is incorrect.  Last night, through an additional interview with Witness 1, the FBI learned that ALI was not in fact present when TAHERZADEH shot Witness 1 with the air rifle.  Instead, Witness 1 stated that ALI otherwise assisted in the fraudulent recruitment effort, as explained below, and was aware of the shooting because Witness 1 spoke with ALI about it.

To be clear, Witness 1 has not changed his/her account of the event.  The error in the original affidavit was result of a mistaken recollection by the FBI Special Agent who interviewed Witness 1 and orally related the details of that interview to me for purposes of my affidavit.  When a review of the notes from that interview did not make clear that ALI was present for the shooting incident, the government undertook a re-interview of Witness 1 last night.

b.  This affidavit also contains additional information obtained from Witness 1, Witness 6, Witness 7, and Witness 8, which is pertinent to probable cause and is intended to further establish TAHERZADEH's and ALI's collaboration in the impersonation scheme.

c.  This affidavit also contains additional information obtained in connection with the arrests of TAHERZADEH and ALI, and about an LLC controlled by TAHERZADEH, "United States Special Police."

6.   This affidavit does not contain all the facts uncovered in the ongoing investigation, but only those necessary to establish probable cause for Conspiracy and Impersonation of an Officer.

## **SUMMARY**

7.   From beginning as early as February 2020 through the present, TAHERZADEH and ALI, have been falsely assuming and pretending to be officers or employees acting under the authority of the United States government, specifically the Department of Homeland Security (DHS), the Department of Justice (DOJ), and the Office of Personnel Management (OPM), and have acted as such.  TAHERZADEH and ALI, are not, in fact, employees of the DHS, DOJ, OPM

or any United States government agency.  TAHERZADEH and ALI have represented themselves as such to numerous people, many of whom are members of federal law enforcement agencies.  In furtherance of their false and fraudulent conduct, TAHERZADEH and ALI obtained paraphernalia with the insignias of and firearms, including handguns and assault rifles, used by federal law enforcement agencies.

8.      During the course of their conduct, TAHERZADEH and ALI have attempted to use their false and fraudulent affiliation with DHS and other government agencies to ingratiate themselves with members of federal law enforcement and the defense community.  Specifically, TAHERZADEH has provided members of the United States Secret Service (USSS) and an employee of DHS with, among other things, rent-free apartments (with a total yearly rent of over $40,000 per apartment), iPhones, surveillance systems, a drone, a flat screen television, a case for storing an assault rifle, a generator, and law enforcement paraphernalia.  TAHERZADEH also offered these individuals use of what TAHERZADEH represented to be "official government vehicles."  In addition, TAHERZADEH offered to purchase a $2,000 assault rifle for a USSS Agent assigned to the First Lady's protective detail.  As of April 4, 2022, as a result of this conduct, four members of the USSS were placed on administrative leave pending further investigation.

9.      In furtherance of their false and fraudulent conduct, TAHERZADEH and ALI recruited individuals to be an "employee of DHS" and "serve on their task force."  In one instance, TAHERZADEH required an applicant to be shot in the shoulder, twice, with an air rifle to "verify" him/her (i.e. to evaluate his/her pain tolerance and reaction).  Subsequent to being shot, the applicant was informed that their hiring was in process.  The applicant was also assigned to conduct research on an individual that provided support to the Department of Defense and intelligence

community.  In another instance, ALI, who represented himself to be an employee of the federal government, took another applicant— as part of the recruiting process—to be fingerprinted and to a shooting range for qualification and certification.

## **PROBABLE CAUSE**

### *Initial Investigation and Allegations*

10.     On March 14, 2022, a United States Postal Inspector (USPIS) responded to 949 1st Street SE, in Washington, D.C., to investigate an alleged assault involving a United States Postal Service (USPS) letter carrier.  The apartment complex, located at 949 1st Street SE, is large and contains multiple units on several floors.  During the course of the investigation, the USPIS inspector learned from individuals living at the apartment complex that two individuals, Arian TAHERZADEH and Haider ALI, who represent themselves as Department of Homeland Security Investigations (HSI) Special Agents, may have witnessed the assault.

11.     The USPIS inspector then interviewed TAHERZADEH and ALI.  Both individuals also self-identified as investigators with the U.S. Special Police Investigation Unit (USSP).  ALI identified the USSP as part of DHS.  Furthermore, ALI identified TAHERZADEH as an HSI Special Agent. TAHERZADEH and ALI identified themselves as deputized "special police" with the city government of the District of Columbia.  TAHERZADEH and ALI claimed to be involved in undercover gang-related investigations as well as conducting investigations related to the violence at the United States Capitol on January 6, 2021.

12.     The USPIS inspector also learned from other residents at 949 1st Street SE that TAHERZADEH and ALI utilize several apartments in the complex.  TAHERZADEH and ALI told these residents that these apartments were being paid for by DHS.

13.     The USPIS inspector was also informed that both individuals utilize a black GMC SUV and describe it as their "official DHS vehicle."  According to residents, this vehicle is equipped with emergency lights.

14.     The USPIS inspector was also informed by residents that TAHERZADEH and ALI have video surveillance set up in various parts of the 949 1st Street SE apartment complex. Furthermore, TAHERZADEH and ALI represented to residents at the apartment complex that they can access, at any time, the cellular telephones of residents of the apartment complex.  These residents stated that they believe that TAHERZADEH and ALI had access to personal information of all the residents at the apartment complex.

15.     The USPIS inspector determined that TAHERZADEH and ALI were in regular contact with several members of the USSS, who also reside at 949 1st Street SE.  These USSS Agents were members of both the Uniformed and Protection divisions. The USPIS inspector learned that TAHERZADEH and ALI had provided gifts to the USSS Agents and their families, including, among other things, the use of their GMC SUV.  Additionally, TAHERZADEH offered to provide a rifle to a member of the USSS valued at approximately $2,000.

16.     The USPIS Inspector provided this information to the DHS Office of Inspector General, which then referred the information to the Federal Bureau of Investigation (FBI) for further investigation.  It was at this point that the FBI began its investigation, which corroborated the statements of residents obtained by the USPIS Inspector.

***FBI Interviews of Apartment Building Residents***

**Witness 1**

17.     Witness 1 lived at 949 1ˢᵗ Street SE in Washington, D.C.  Witness 1 is not employed by any federal law enforcement entities.

18.     In or around July 2021, TAHERZADEH represented to Witness 1 that he was a Special Agent with HSI.  TAHERZADEH represented that ALI was affiliated with HSI, but had no arrest powers.

19.     Witness 1 has seen TAHERZADEH'S DHS/HSI badge as well as credentials from USSP.

20.     Witness 1 observed TAHERZADEH carrying a firearm concealed on his person.

21.     While in apartments controlled and maintained by TAHERZADEH, Witness 1 has observed computer equipment, surveillance equipment, and servers.

22.     TAHERZADEH also showed Witness 1 a "HSI casefile" of a person TAHERZADEH was "working on."  The casefile was marked "Confidential."

23.     In or around mid-September 2021, TAHERZADEH "recruited" Witness 1 to serve as an employee of HSI.  According to Witness 1, because he/she believed that TAHERZADEH was an employee of HSI, he/she agreed to pursue DHS/HSI employment through him. TAHERZADEH represented that he had started the process of hiring Witness 1 as an employee of DHS/HSI and that he also had authority to "deputize" individuals as employees of DHS/HSI.

24.     During a discussion of roles in HSI, with ALI and TAHERZADEH, they told Witness 1 that he would have to carry a firearm for certain jobs.  At that point, ALI and

TAHERZADEH showed Witness 1 that they were carrying handguns.  Specifically, ALI possessed what appeared to be a firearm concealed on his person, inside his waistband.[1]

25.   TAHERZADEH asked Witness 1 about his background.   Witness 1 told TAHERZADEH that he was divorced and, that as a result of a restraining order, he could not possess a firearm.  Witness 1 asked TAHERZADEH about handling a firearm with HSI and TAHERZADEH responded that "we can take care of that."

26.   Subsequently, TAHERZDEH told Witness 1 that there was a private court hearing with an agent and the restraining order was removed and/or redacted from the National Crime Information Center (NCIC) and no longer in his background.  Witness 1 told TAHERZADEH he wanted to call an attorney, but TAHERZADEH told him that call would mess everything up and that, as a result of the hearing, Witness 1 could now carry a firearm and credentials.

27.   As part of the "HSI recruiting process," TAHERZADEH tasked Witness 1 to conduct research into an individual who worked for the United States government as a contractor. Specifically, this individual provided support to the Department of Defense and Intelligence Community.

28.   Further, TAHERZADEH told Witness 1 that as part of the recruiting process, TAHERZADEH would have to shoot Witness 1 with an air rifle in order to "verify" him—that is, to evaluate Witness 1's reaction and pain tolerance.  According to Witness 1, because he/she believed this was part of the DHS/HSI recruiting process he/she agreed to be shot and subsequently was shot by TAHERZADEH twice, at least once in the shoulder.

---

[1] ALI's Glock 19 with an inside the waistband concealed holster was recovered form Penthouse 5.

29.     According to Witness 1, ALI was not present with TAHERZADEH when he shot Witness 1 with the air rifle.  Witness 1 stated that ALI was aware that TAHERZADEH was recruiting Witness 1 for HSI and of the fact that TAHERZADEH had shot Witness 1 with an air rifle.  Witness 1 stated that ALI was aware of this because Witness 1 had discussed it with ALI and further because Witness 1 understood, based on their representations, that ALI and TAHERZADEH worked together in law enforcement, specifically HSI.

**Witness 2**

30.     Witness 2, a USSS Agent, assigned at times relevant to this affidavit to the First Lady's protection detail, lives at 949 1st Street SE in Washington, D.C.

31.     On or about July 4, 2021, Witness 2 was introduced to TAHERZADEH, who represented that he was an HSI Agent and that ALI was an HSI Analyst.   Although TAHERZADEH was very outspoken about his job with HSI, he claimed that he was part of a covert task force.

32.     According to Witness 2, TAHERZADEH made it clear that he is the "go-to guy" if a resident needs anything in the building.  TAHERZADEH provided gifts or favors for residents, many of whom were members of law enforcement, including the FBI, USSS, or DHS, or employees of government agencies, including the Department of Defense and Navy.  For instance, TAHERZADEH previously loaned out his "government vehicle" to Witness 2's wife, and also provided her with a generator.  TAHERZADEH offered to provide Witness 2 an AR-15 style rifle that is valued at around $2,000.

33.     Witness 2 confirmed that TAHERZADEH and ALI both live at 949 1st Street SE. Witness 2 stated ALI lives in a separate apartment on the floor below TAHERZADEH.

34.     Witness 2 noted that TAHERZADEH'S primary apartment has numerous security cameras.   TAHERZADEH has shown Witness 2 security footage from various areas of the apartment complex, indicating that he had gained access to the security system for the entire apartment complex.   Subsequent investigation revealed that many residents in this apartment complex are affiliated with federal law enforcement agencies.

35.     In furtherance of his efforts to represent himself to be a member of DHS/HSI, TAHERZADEH sent Witness 2 a photo in an HSI "vest" (see below).



36.     Witness 2 has also seen several other photos of TAHERZADEH in police tactical gear.   TAHERZADEH sent Witness 2 these photos (see below).



37.     TAHERZADEH has sent Witness 2 several photos of police gear in TAHERZADEH'S apartment (see below).  In the first photo, Pelican cases, which are often used to carry firearms, appear on a shelf behind TAHERZADEH.



38.    On February 22, 2022, TAHERZADEH sent Witness 2 pictures of what TAHERZADEH claimed to be an HSI in-service training (see below).  The investigation revealed that the photo TAHERZADEH sent is a stock photo from the internet, and there is no record that TAHERZADEH participated in any HSI training.



39.    While in TAHERZADEH's primary residence, Witness 2 saw a Federal Law Enforcement Training Center (hereinafter "FLETC") training certificate that he/she believed to be associated with TAHERZADEH.

40.     On multiple occasions in 2021 and 2022, Witness 2 observed TAHERZADEH carrying a Glock 19 Generation 5 firearm with a TLR-7A Streamlight flashlight attachment. Witness 2 also observed TAHERZADEH carrying this firearm concealed with an inside-the-waistband holster.  TAHERZADEH told Witness 2 that this was his HSI-issued firearm.  Witness 2 has seen TAHERZADEH wear this firearm in public, outside of his apartment as well as inside the apartment.

41.     On or about February 2, 2022, Witness 2 told TAHERZADEH that on February 17, 2022, Witness 2 would be attending USSS's Glock transition course.  Witness 2's federal agency was in the process of transitioning from P229 Sig Sauer to Glock 19 Generation 5 as the issued service weapon.  At some point after Witness 2 had received the issued Glock 19 Generation 5, TAHERZADEH made a comment "we are all transitioning to the Glock 19s in DHS."  After TAHERZADEH made that comment, TAHERZADEH pulled a concealed Glock 19 Generation 5 from his appendix area.  TAHERZADEH demonstrated that his was identical to Witness 2's issued Glock 19 Generation 5, to include the TLR-7A Streamlight flashlight attachment.

42.     On or about the second week of March 2022, TAHERZADEH appeared at Witness 2's apartment carrying a Glock 19 Generation 5 in a Ayin Tactical Holster.  TAHERZADEH stated that he had an extra holster and wanted to give Witness 2 the Ayin Tactical Holster for Witness 2's newly issued Glock 19 Generation 5.  Witness 2 is still in possession of this holster.

**Witness 3**

43.     Witness 3, a member of the USSS, Uniformed Division, assigned at times relevant to this affidavit to protect the White House complex, lived in a penthouse apartment at 949 1st Street SE, in Washington, D.C. from approximately February 2021 to January 2022.

44.     TAHERZADEH   introduced   himself   to   Witness   3   as   an   HSI   agent. TAHERZADEH told Witness 3 that he is currently in a gang unit with DHS, and that TAHERZADEH used to work in crimes against children.  Witness 3 stated that TAHERZADEH'S credentials say ICE on them and indicate that he is a Special Agent.

45.     TAHERZADEH provided Witness 3 with a rent-free penthouse apartment for approximately one year, which cost approximately $40,200.   According to Witness 3, TAHERZADEH paid for another federal law enforcement officer's rent in the apartment complex.

46.     Witness 3 confirmed that TAHERZADEH lives in and has several apartments in the complex.

47.     Witness 3 stated that he/she received an email from what he/she believed to be TAHERZADEH'S DHS email: ataherzadeh@dhs.ussp.us.  Witness 3 also recalled that the email he/she received from this address has disclaimers regarding receiving information from a federal agency.  Subsequent investigation confirmed that this email address is false and fraudulent, and not a genuine United States government email address.

48.     While in TAHERZADEH's primary residence, Witness 3 observed that TAHERZADEH possessed FLETC training certificates and a Private Identity Verification card, commonly referred to as a "PIV card," which Witness 3 saw TAHERZADEH use to access a laptop that is labeled with a "DHS" symbol.  Witness 3 stated that he/she saw a federal logon privacy notice when TAHERZADEH logged onto his DHS computer.

49.     Beginning in 2021, Witness 3 observed TAHERZADEH carrying a Glock 19, but cannot state how recently that occurred.  The most recent date possible is January 2022.

50.     TAHERZADEH provided Witness 3 with gifts including, an HSI coin and DHS patch.

51.     Witness 3 confirmed that ALI lives in the apartment complex, though he/she could not specify where ALI works.

**Witness 4**

52.     Witness 4 is a Document Analysis Expert with DHS-HSI and lives in the apartment complex located at 949 1ˢᵗ Street SE, Washington, D.C.

53.     In or around June of 2021, TAHERZADEH approached Witness 4 and told him/her he knew Witness 4 was affiliated with HSI or possibly the United States Citizenship Immigration Service (USCIS), which is in DHS.  TAHERZADEH told Witness 4 that he was an HSI Agent but that he was working undercover.  Witness 4 talked to her supervisors about TAHERZADEH and was unable to verify his information through HSI internal databases.  When Witness 4 confronted TAHERZADEH about this inability to locate his name in the HSI database, TAHERZADEH claimed that his name was redacted due to his undercover status.

54.     Witness 4 observed TAHERZADEH carrying a weapon, which he/she believes is a handgun, and stated that TAHERZADEH always carries it.

55.     TAHERZADEH claimed to Witness 4 that he has a list of all of the federal agents in the apartment complex.  Witness 4 stated that TAHERZADEH has codes to the elevators that gives him access to every floor, which is beyond what a normal resident possesses.

56.     While in TAHERZADEH's primary residence, Witness 4 saw a significant amount of law enforcement paraphernalia, including SWAT vests, a large safe, computers, a high-powered

telescope and internal surveillance cameras in his apartment.  TAHERZADEH has shown Witness 4 surveillance footage from around the apartment complex.

**Witness 5**

57.     Witness 5 is a member of the USSS, Uniformed Division, assigned at times relevant to this affidavit to protect the White House complex, and lived in a three-bedroom apartment at 949 1st Street SE, in Washington, D.C. from February 2021 to January 2022.

58.     Throughout that period, TAHERZADEH provided Witness 5 with a rent-free three-bedroom apartment, with an estimated value of approximately $48,240.  Specifically, TAHERZADEH told Witness 5 that HSI had approved extra rooms as part of his operations, and that Witness 5 could live in one of them for free.  The investigation confirmed that there are no such HSI operations and that it authorized no such expense

59.     TAHERZADEH claimed to be an agent with HSI in the gang unit. TAHERZADEH told Witness 5 that being a special police officer, part of USSP, was the "front end" of his HSI task force.  Witness 5 has seen TAHERZADEH tell other individuals at 949 1st Street that he is an HSI agent and detail the training to become an HSI agent.  Witness 5 has seen TAHERZADEH interact with the Metropolitan Police Department (MPD) while wearing HSI gear.  For instance, according to Witness 5, on one occasion MPD responded to the apartment complex because of a complaint that TAHERZADEH was wearing police equipment.  Witness 5 stated that MPD responded to the scene but did not take any action.

60.     Witness 5 recalled that TAHERZADEH had a PIV card, which he believes said DHS on it, and that the background on TAHERZADEH's computer had "DHS information." TAHERZADEH showed Witness 5 an HSI badge and special police officer credentials.  Witness

5 said that TAHERZADEH identified himself primarily as DHS/HSI, but he carried the special police officer badge on his person more often.  Witness 5 has seen DHS/HSI on TAHERZADEH'S ballistic vest as well.

61.     Since approximately February 2020, Witness 5 has seen TAHERZADEH carry a Glock 19 on his person.  Prior to the Glock, Witness 5 saw TAHERZADEH with a 226 or 229 handgun.  TAHERZADEH would carry the Glock 19 on his belt, both concealed and overt. Witness 5 has examined these firearms and believed them to be real.  Witness 5 also saw live rounds.  Witness 5 has also seen TAHERZADEH shoot a Glock 19 at the gun range.  Witness 5 also shot one of TAHERZADEH'S AR-15 style rifles at the gun range.  Witness 5 provided a video of TAHERZADEH using a rifle matching this description at a gun range in Northern Virginia.

62.     Witness 5 has seen TAHERZADEH drive two black "Tahoe" like vehicles and an Impala equipped with police lights.

63.     While in TAHERZADEH's primary residence, Witness 5 recalled seeing a desktop computer, cameras, and a gun locker.  On the walls of the apartment, Witness 5 saw a FLETC certificate and "Police 1" certificates.  Witness 5 also saw DHS patches, a handgun, a rifle, and Airsoft guns.  Witness 5 recalled that the rifle was kept in TAHERZADEH'S office in his primary residence and that a gun was hidden under a desk in the living room.

64.     While in another apartment maintained and controlled by TAHERZADEH, Witness 5 recalled seeing police equipment, computer monitors, and a computer server. TAHERZADEH told Witness 5 that all of this equipment was for use in connection with the HSI task force.

65.     TAHERZADEH gave Witness 5 gifts, including a drone, a gun locker, and a Pelican case.

66.     Witness 5 stated that TAHERZADEH also rents a number of other apartments in the building.

67.     In or around January 2022, Witness 5 moved out of the rent-free apartment TAHERZADEH provided him.  Witness 5 then observed TAHERZADEH began moving law enforcement and computer equipment into that apartment.

68.     Witness 5 said that TAHERZADEH has full access to all floors of the apartment complex and some restricted areas, and believes TAHERZADEH spoke with management of the apartment complex and was able to get access to these areas because of his HSI operation.  Witness 5 further stated that TAHERZADEH has a document, which he/she has seen, containing the names and room numbers of residents in the apartment complex.

69.     TAHERZADEH told Witness 5 that ALI took care of all administrative issues with TAHERZADEH'S HSI task force.

**Witness 6**

70.     Witness 6, a former United States Marine, stated that ALI represented himself to be an employee of the federal government. TAHERZADEH represented himself to be an HSI Agent and ALI to be a federal official of the Office of Personnel Management (OPM) with investigative authority.

71.     TAHERZADEH told Witness 6 that USSP was setup and funded by the federal government.  Specifically, TAHERZADEH told Witness 6 that USSP was setup as a private organization in order to allow the government to avoid the Freedom of Information Act (FOIA).

72.     TAHERZADEH told Witness 6 that he had Special Police credentials with MPD because, in his role as an HSI Agent, he did not have local arrest authority and the Special Police credentials provided him that authority.  TAHERZADEH also told Witness 6 that he did not carry his HSI credentials because he is not permitted to carry two sets of credentials at the same time.

73.     Witness 6 stated that building management, as well as Witness 3 and Witness 5, (both of whom lived in the building), also told Witness 6 that TAHERZADEH was an HSI Agent.

74.     According to Witness 6, TAHERZADEH and ALI recruited Witness 6 to be "deputized" through MPD as a special police officer, which TAHERZADEH would allow Witness 6 to assist  TAHERZADEH and ALI in HSI operations.  TAHERZADEH encouraged Witness 6 to be deputized, stating it would "open many doors" for Witness 6, such as obtaining a higher security clearance.  Based on these representations, Witness 6 understood that ALI's role in the deputization process was to facilitate it, and that TAHERZADEH's role was to be the "team lead."

75.     TAHERZADEH had Witness 6 fill out a detailed application, which was notarized. In addition, while in TAHERZADEH's apartment and another apartment maintained and controlled by TAHERZADEH, TAHERZADEH administered two urine tests and implemented a fingerprint test on Witness 6.   TAHERZADEH told Witness 6 that he had submitted the fingerprints to the FBI for review.  TAHERZADEH later provided Witness 6 with a letter on FBI letterhead stating that the fingerprint review had been completed and there had been "no prior arrest data at the FBI."   Witness 6 provided this letter to the FBI, which is still investigating the letter's authenticity.

76.     In or around May 2021, ALI provided Witness 6 with information and fee requirements for a shooting certification course which Witness 6 understood to be part of the

recruitment process.  ALI took Witness 6 to a firearms range in Upper Marlboro, Maryland.  When they arrived at the range, ALI provided Witness 6 with a Glock 19 and ammunition which Witness 6 had seen ALI had transport from Washington D.C.  Witness 6 shot a qualification course and received a certificate title "Armed Special Officer Firearms Course Certificate."  At the end of the certification course, Witness 6 returned the Glock 19 to ALI and was driven back to Washington, D.C.  In the course of this investigation, Witness 6 provided the FBI with a copy of the certificate.

77.     In or around June 2021, ALI texted Witness 6 and asked him to meet him downstairs outside the apartment building.  ALI then discussed with Witness 6 progress in the application process.

78.     TAHERZADEH told Witness 6 that a local fingerprint scan was required at MPD and that he had scheduled an appointment for Witness 6 to get the scan on June 28, 2021.  Witness 6 went to MPD headquarters in Judiciary Square on the designated day but was turned away because he/she was told that he/she did not have an appointment.  TAHERZADEH provided Witness 6 with a second date and time to be fingerprinted at MPD, but when he arrived he was denied a second time.

79.     According to Witness 6, in or around July 2021, ALI accompanied him and Subject 1 to MPD to get them fingerprinted.  At the main check-in desk, ALI showed the MPD employee his badge and/or his credentials and was able to bypass security without being screened.

80.     ALI was permitted to escort Witness 6 and Subject 1 through the building and up to the fingerprint office.  ALI showed his badge and told the MPD employees that he did not have a scheduled appointment, but an MPD sergeant should have contacted the office to make sure they could get fingerprinted.  Witness 6 also believes, at that time, ALI identified himself as some form

of law enforcement but he could not be certain.  After a period of arguing with the MPD fingerprint staff, ALI escalated the issue to a supervisor in private and, subsequently, Witness 6 had his fingerprints taken.

81.     Witness 6 stated that he would not have participated in the "deputization" process or agreed to be fingerprinted if he did not believe that TAHERZADEH was a federal agent with Homeland Security and that ALI was a federal official at OPM with investigative authority.

82.     TAHERZADEH created an email account for Witness 6 that contained his name and @dhs.ussp.us.  Witness 6 thought this was a DHS email account due to the "@dhs" in the email address.

83.     According to Witness 6, TAHERZADEH told him that he needed to obtain a firearms certification and qualify with a Glock 19 in order to work as a "deputy" for TAHERZADEH.

84.     Witness 6 also stated that, while in an TAHERZADEH's apartment, he observed a Glock 19 firearm and a Sig Sauer 229 firearm in the presence of both TAHERZADEH and ALI. Specifically, while in TAHERZADEH's apartment, using live firearms, ALI and TAHERZADEH would conduct weapons handling drills, including disarming an armed subject, "tap and racks" involving loading and clearing the weapon, and holstering and unholstering of the sidearm.

85.     In addition, Witness 6 reported seeing an AR-15/M-4 variant rifle with a suppressor, which had also been modified to be an illegal automatic weapon—on multiple occasions—in TAHERZADEH's apartment.

86.     Witness 6 also saw TAHERZADEH in possession of an AR Pistol with a modified brace, which TAHERZADEH said belonged to an USSS Agent.

**Witness 7**

87.     Witness 7, a resident of Washington, D.C., stated that one night in early February 2022, Witness 7 and  his/her friends went to The Mayflower Club in Dupont Circle.  That evening, while at the club. ALI claimed he was a federal law enforcement officer and worked for the federal government.

88.     At the end of the night, ALI offered to drive Witness 7 and his/her friends home from the club.  During the ride, Witness 7 and his/her friends joked about whether ALI actually worked for the government.  According to Witness 7, that joke prompted ALI to change his demeanor and show the group different pieces of "government" identification including what appeared to be a building access badge and badge.  At that point, ALI specified that he worked for the Department of Justice.  ALI and Witness 7 exchanged numbers and continued to text on and off in the following weeks.

89.     In or around February 2022, Witness 7 was out with two of his/her friends at a bar and ALI offered to send them an UBER to bring them back to 949 1st Street SE, Washington, D.C., his apartment building.

90.     Witness 7 and his/her friends arrived at the designated apartment, where they met TAHERZADEH.  At that point, ALI was not present nor did the apartment appear to belong to ALI.  Indeed, the apartment they went to belonged to TAHERZADEH

91.     According to Witness 7, TAHERZADEH stated that ALI worked for/with him and would arrive shortly.  TAHERZADEH claimed to work for a special law enforcement unit affiliated with DHS and responsible for investigating federal crimes.  TAHERZADEH also claimed to have prior military experience.  In furtherance of these claims, Witness 7 said,

TAHERZADEH produced identification cards, including a military identification card, a badge displaying law enforcement markings, and a card that displayed a DHS identifier.

92.     At some point in the night, before ALI arrived, the group got into a verbal altercation about Black Lives Matter and Blue Lives Matter.  TAHERZADEH, being more politically conservative, allegedly got upset and "freaked out."  TAHERZADEH claimed that he owned guns and that if Witness 7 and her friends were men and stated their political beliefs in his home, he would have shot them.

93.     ALI then arrived with an individual that ALI described as a USSS Agent.

94.     TAHERZADEH gave the Witness 7 a tour of the apartment and showed them his "security room" and stated that, in order to work for DHS, one needed a dedicated room for documents and computers.  Witness 7 observed a handgun in plain view which TAHERZADEH said belonged to the USSS Agent.  Witness 7 also observed a handgun holstered on TAHERZADEH's hip.  TAHERZDEH told the group that the apartment was paid for by DHS.

### *Witness 8*

95.     Witness 8 manages the parking garage located at 949 1st Street SE, Washington, D.C.

96.     On or about December 1, 2020, Witness 8 was notified by apartment management that "United States Special Police Officers" were becoming residents of the complex.

97.     ALI told Witness 8 that he moved to the apartment complex because he was in Washington, D.C. for a special assignment, detailed to the White House.  ALI told Witness 8 that he needed to park five vehicles at the apartment complex.  He also represented that they were

government vehicles necessary for his detail.  The cost of parking the vehicles was $1,525 per month ($258.48 per vehicle).

98.     Witness 8 asked ALI who would be paying the bill for all (5) vehicles and if it would be a GSA contract.  ALI responded not to worry about it as it would be "taken care of." Witness 8 understood that the parking permits would be paid by the Federal Government.

99.     By May 2021, USSP's parking bill had not been paid.  WITNESS 8 and the staff continuously reached out to ALI regarding the bill and ALI always used the excuse that he was extremely busy with his detail with the White House and his investigations.   ALI requested that the parking transponder not be discontinued because he needed the vehicles for his investigation.

100.    In or around May 2021, ALI contacted Witness 8 in a three-way call with "Kevin Fuller," who ALI introduced to be his direct supervisor at United States Special Police.[2]  "Kevin Fuller" assured Witness 8 that the payment for parking would soon be arriving.  By this time, the parking bill was approximately $7,854.50.

101.    Beginning in or around June 2021, the USSP account was threatened to be suspended, and the existing permit holders, which included ALI, Witness 3, and Witness 5, who were under the USSP account, were required to individually pay their monthly parking fee.

102.    Witness 8 stated that he never observed ALI with any weapons.  However, during a period of time when the garage was offering to valet cars, ALI told Witness 8 that he could not have ALI's vehicles valet parked because of the weapons he has in his vehicle.

---

[2] During a post-arrest interview, TAHERZADEH admitted that Kevin Fuller was a false and fictious person that was used to also sign the apartment lease.

103.    Witness 8 also stated that ALI approached the parking attendants and requested tools to remove a "boot" that was installed on a resident's vehicle.  ALI said he was authorized to remove the boot because of his law enforcement status.

### Information Obtained Arising from the Arrests of TAHERZADEH and ALI

104.    On April 6, 2022, TAHERZADEH and ALI were arrested together at a restaurant in Southeast Washington, D.C., after being seen leaving 949 1st Street together.  That arrest led to additional information pertinent to the investigation.

105.    For instance, during a post-arrest interview TAHERZADEH admitted to much of the conduct above.  Specifically, he admitted that:

    a.  He had falsely identified himself as a member of the Department of Homeland Security;

    b.  He had falsely identified himself as a former United States Army Ranger;

    c.  The Sig Sauer 229 firearm belonged to him and was in his possession;

    d.  The Glock 19 firearm belonged to ALI, but TAHERZADEH had possessed it as well;

    e.  He offered to provide a USSS agent with an assault rifle;

    f.  He provided free apartments to two USSS agents for approximately one year;

    g.  He had provided a "doomsday bag," generator, flat screen television, two iPhones, a drone, a gun locker, a Pelican case, and a mattress to agents and officers of the USSS;

h.   He did in fact shoot someone, identified in the complaint as Witness 1, with an Airsoft gun[3];

i.   Subsequent to ALI representing to the Postal Inspector that TAHERZADEH and ALI were part of DHS and then being questioned by the inspector, Taherzadeh began deleting law enforcement related material from his social media.  Metadata recovered from TAHERZADEH's phone also shows that he deleted photos not only from social media, but from his phone;

j.   ALI had obtained the electronic access codes and a list of all of the tenants in the apartment complex.

k.   ALI was the individual that funded most of their day-to-day operation but TAHERZADEH did not know the source of the funds.

### Corporate Records

106.   "United Special Police LLC" (USSP) is a Washington, D.C., limited liability company, with a registered address associated with a residence maintained and controlled by TAHERZADEH.  TAHERZADEH is the beneficial owner of USSP.

107.   On USSP's website, USSP is described as a private law enforcement, investigative, and protective service headquartered in Washington, D.C.  The website goes on to say that USSP can provide law enforcement, protective services, and investigative services within a contracted jurisdiction.

---

[3] Taherzadeh claimed that this was not part of the DHS recruitment process and that he allowed the individual to shoot him as well with the Airsoft rifle.

## **CONCLUSION**

108.     Based on my training and experience, and the information provided in this amended affidavit, there is probable cause to believe that as early as February 2020, in the District of Columbia and elsewhere, ARIAN TAHERZADEH and HAIDER ALI did falsely assume or pretend to be an officer or employee acting under the authority of the United States or any department, agency or officer thereof, and acts as such, in violation of Title 18, United States Code, Section 912.

_____
David Elias
Special Agent, Federal Bureau of Investigation


Sworn and subscribed to before me this _____ day of April, 2022,


_____
The Honorable G. Michael Harvey
United States Magistrate Judge